RECEIVED BY MAIL
MAR 18 2025
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Case No.: 0:25-cv-00398-LMP-DLM

In the United States District Court
for the District of Minnesota

Jose Osorio-Calderon
Petitioner,

v.

Warden FCI Sandstone,
Respondent.

# Petitioner's Brief In Support Of Petition For A Writ Of Habeas Corpus (28 U.S.C. §2241)

## Petitioner's First Brief In Support

Petitioner pro se
Jose Osorio-Calderon
FCI Sandstone
P.O. Box 1000
Sandstone, MN 55072

SCANNED
MAR 18 2025
U.S. DISTRICT COURT MPLS

# Table of Contents


I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Exhaustion is Unnecessary or Futile . . . . . . . . . . . . . . . 2

B. Jurisdiction of the Court . . . . . . . . . . . . . . . . . . . . 3

II. Factual Background of Case . . . . . . . . . . . . . . . . . . . 4

III. Reasons to Grant Writ . . . . . . . . . . . . . . . . . . . . . 6

A. Section 3621(b)'s "not withstanding" clause opens the door for this Petition to be heard on the merits. . . . . . . . . . . . . . 7

B. The Bureau of Prison's reasons for not transferring petitioner to prerelease custody are not valid under the Congressionally established statutory scheme. . . . . . . . . . . . . . . . . . . 9

(1) The controlling statutes are clear and unambiguous, not requiring any agency interpretation, only compliance. . . . . 9

(2) Post Loper Bright (144 S. Ct. 2244) judicial deference to agency interpretation is either inapplicable or requires that any previous rulings on FSA time credit incentives be thoroughly reexamined. . . . . . . . . . . . . . . . . . . 16

(3) In promulgating the relevant regulations the Department of Justice impermissibly altered the implementation of the FSA Time Credits Incentive, when they performed a linguistic shuffle of critical words. . . . . . . . . . . . 18

(4) The BOP's reasons for not transferring petitioner to prerelease custody are not valid under the FSA's statutory scheme. . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. Post the First Step Act of 2018 the BOP's previously unlimited authority is now clearly delimited to how and where to apply credits, but no longer extends to whether, or how many credits, Petitioner is to receive. . . . . . . . . . . . . . . 20

(1) Under 18 U.S.C. §3632 the BOP's role is limited to the record keeping tasks of: identifying qualifying prisoners; calculating their credits; and calculating their "shall transfer date." . . . . . . . . . . . . . . . . . . . . . . 22

(2) The BOP's exclusive placement authority regarding pre-release transfer under 18 U.S.C. §3621 is now limited to the mechanics of how and where the FSA cohort pre-release transfers occur. . . . . . . . . . . . . . . . . . . . . . . 24

(3) Congress authorized partnerships with the U.S. Probation and Pretrial Services to assist with "any prisoner's" FSA pre-releaser, and to assume supervision of home confinement prisoners. . . . . . . . . . . . . . . . . . . . 25

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# Table of Authorities

**Case** **Page(s)**

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.
467 U.S. 837 (1984). . . . . . . . . . . . . . .12, 15, 16, 17, 18

Crowe v BOP
No. 1:24-cv-03582 (D.D.C., filed 12-20-2024). . . . . . . . . 19

Elwood v. Jeter
386 F.3d 842, 844 n.1 (8th Cir. 2004). . . . . . . . . . . . . . 2

Groff v. DeJoy
600 U.S. 447, 468 (2023) . . . . . . . . . . . . . . . . . . . . 9

Goodwin v Goldey
No. CIV-23-00773-PRW, 2023 U.S. Dist. LEXIS 230808, at *3
(W.D. Okla. 2023). . . . . . . . . . . . . . . . . . . . . . 23

Gurzi v. Marques
No. 18-cv-3104 (NEB/KMM), 2019 U.S. LEXIS 208173, 2019 WL
6481212., at *2 (D. Minn. 2019). . . . . . . . . . . . . . . . . 2

Jorgensen v. Birkholz
No. 20-cv-2349 (NEB/DTS), 2021 U.S. Dist. LEXIS 130220, at *15
(D. Minn. 2021) . . . . . . . . . . . . . . . . . . . . . . . 8

LaCurtis v. Express Med Transps., Inc.
856 F.3d 571, 578 (8th Cir. 2017). . . . . . . . . . . . . . 12

Loper Bright Enterprises v. Raimondo
144 S. Ct. 2244 (2024) . . . . . . . . . . . . . 12, 15, 16, 17

Luque v Fed. Bureau of Prisons
No. 23-CV-3893 (NEW/DLM), 2024 U.S. Dist. LEXIS 69190, at *8
(D. Minn. Mar. 5, 2024). . . . . . . . . . . . . . . . . . . . 23

Maine Community Health Options v. United States
590 U.S. 296, 310 (2020) . . . . . . . . . . . . . . . . . . . 6

Preiser v. Rodriguez
411 U.S. 475, 484, 498-500 (1973). . . . . . . . . . . . . . . . 3

Rodriguez v Smith
541 F.3d 1180,1189 (9th Cir. 2008). . . . . . . . . . . . . 20, 22

Silva v. Paul
No. 18-cv-02177 (ECT/ECW), 2019 U.S. Dist. LEXIS 21699
(D. Minn. 2019) . . . . . . . . . . . . . . . . . . . . . . . . 3

Southwest Airlines Co. v. Saxon
596 U.S. 450, 455 (2022) . . . . . . . . . . . . . . . . . . . 12

Spencer v. Haynes
774 F.3d 467, 470 (8th Cir. 2014). . . . . . . . . . . . . . . 8

Tapia v. United States
564 U.S. 319, 331 (2011) . . . . . . . . . . . . . . . . 8, 9, 24

United States v. Smith
No. 6:15-cr-00006-001, 2019 U.S. Dist. LEXIS 145212, at *5
(W.D. Va. 2019)(Moon, J.). . . . . . . . . . . . . . . . . . . 23

Vang v. Eischen
No. 23-cv-721 (JRT/DLM), 2023 U.S. Dist. LEXIS 149163
(D. Minn. 2023). . . . . . . . . . . . . . . . . . . . . . 2, 8

Wessels v. Houden
No. 23-cv-1266 (WMW/ECW), 2023 U.S. Dist LEXIS 194685, at *4
(D. Minn. 2023). . . . . . . . . . . . . . . . . . . . . . . . 8

Wilkerson v. Dotson
544 U.S. 74, 78 (2005) . . . . . . . . . . . . . . . . . . . . 3

William v Warden, Allenwood-Low
No. 23-cv-509-LM-AJ, 2024 U.S. Dist. LEXIS 165919, at *12
(M.D. Pa. Sept. 16, 2024). . . . . . . . . . . . . . . . . . 23
100-199, 122 Stat. 657 . . . . . . . . . . . . . . . . . . . 24

Woodall v. Fed Bureau of Prisons
432 F.3d 235 (3d Cir. 2005). . . . . . . . . . . . . . . . . . 3

**Statute**

18 U.S.C. §924(c) . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §3621 . . . . . . . . . . . . . . . . . . . . . 6, 24

18 U.S.C. §3621(b) . . . . . . . . . . . . . . . 6, 7, 8, 23, 24

18 U.S.C. §3624 . . . . . . . . . . . . . . . . . . . . 10, 21

18 U.S.C. §3624(c). . . . . . . . . . . . . . . . . . . 21, 24

18 U.S.C. §3624(e). . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. §3624(g) . . . . . . . . . . . . . . . . 10, 24, 26

18 U.S.C. §3624(g)(1) . . . . . . . . . . . . . 12, 13, 19, 24

18 U.S.C. §3624(g)(1)(A) . . . . . . . . . . . . . . . . . . 20

18 U.S.C. §3624(g)(1)(B) . . . . . . . . . . . . . . . . . . 20

18 U.S.C. §3624(g)(1)(C) . . . . . . . . . . . . . . . . . . 20

18 U.S.C. §3624(g)(1)(D) . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. §3624(g)(2) . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. §3624(g)(3) . . . . . . . . . . . . . . . . . . 21, 24

18 U.S.C. §3624(g)(7) . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. §3624(g)(8) . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. §3624(g)(10) . . . . . . . . . . . . . . . . . 21, 23

18 U.S.C. §3624(g)(11) . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. §3625 . . . . . . . . . . . . . . . . . . . 6, 7, 22

18 U.S.C. §3631 . . . . . . . . . . . . . . . . . . . . . 6, 11

18 U.S.C. §3632 . . . . . . . . . . . . . . . . 11, 20, 21, 22

18 U.S.C. §3632(d) . . . . . . . . . . . . . . . . 12, 15, 22

18 U.S.C. §3632(d)(1) . . . . . . . . . . . . . . 13, 15, 21

18 U.S.C. §3632(d)(2) . . . . . . . . . . . . . . 13, 15, 21

18 U.S.C. §3632(d)(3) . . . . . . . . . . . . . . 13, 15, 21

18 U.S.C. §3632(d)(4) . . . . . . . . . . . . . . . . . Passim

18 U.S.C. §3632(d)(4)(C) . . . . . . . . . . . . . . . Passim

28 U.S.C. §1361 . . . . . . . . . . . . . . . . . . . 3, 9, 27

28 U.S.C. §2231 . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. §2241 . . . . . . . . . . . . . . . . . . . 3, 6, 27

Congressional Acts

First Step Act of 2018 P.L. 115-391, 132 Stat 5239 . . . . Passim

Second Chance Act of 2007 P.L. 110-199, 122 Stat 657 . 21, 22, 23

Regulation

28 C.F.R. §523.42 . . . . . . . . . . . . . . . . . . . . . . 7

28 C.F.R. §523.44 . . . . . . . . . . . . . . . . . . . . . . 7

<u>Other</u>

FSA Congressional Debate, 14 Cong. Rec. §7746
(Daily Ed. Dec 18, 2018). . . . . . . . . . . . . . . . . . . . 14

Antonin Scalia & Bryan A Garner, Reading Law . . . . . . . . . 6

Blacks Law Dictionary (10th ed. 2014) . . . . . . . . . . . . 13

Atty. General's Sec 3634 Annual Report at 41-42
(June 2024). . . . . . . . . . . . . . . . . . . . . . . 1, 6, 23

Webster's New World College Dictionary (4th ed. 2010) . . . . 13

# Table of Abbreviations

Appeal Rule - Federal Rules of Appellate Procedure

AIC - Adults in Custody

APA - Administrative Prodecures Act, Ch. 324, 60 Stat. 237, 5 U.S.C. §701 (1946)

BOP - Bureau of Prisons

Civil Rule - Federal Rules of Civil Procedure

Cr. Doc. - Refers to documents filed on the underlying criminal docket.

CSW - Case Worker

Doc. - Refers to documents filed on the civil docket.

FHPP - Randy Hertz & James S. Liebran, Federal Habeas Corpus Practice and Procedure (Matthew Bender 7th ed. 2016)

FRP - Financial Responsibility Program 28 C.F.R. 545.10 et seq

FSA - First Step Act, P.L. 115-391, Title I, 143 Stat 5196 (2018)

FSA PRD - First Step Act, Projected Release Date

FTC - FSA Time Credit

Habeas Rules - Federal Rules Governing §2254 (and §2241) Proceedings

RDAP - Residential Drug Abuse Program

RRM - Reentry Release Manager

SCA - Second Chance Act of 2007, P.L. 110-199, 122 Stat 657 (2008)

# I. Introduction[1]

Our Nation is experiencing a mass incarceration crisis. On the whole, lengthy prison terms harm adults in custody, their families and our communities without an offsetting benefit to society[2]. In response to this crisis, Congress passed the First Step Act of 2018 (FSA). The FSA enacted a variety of reforms, including reducing the mandatory minimum sentences applicable to repeat offenders, eliminated 924(c) stacking and, as is relevant here, transformed the carceral system into a system with a substantial non-carceral component. Specifically, under the FSA, non-violent offenders with low risks of recidivism are entitled to spend a substantial portion of the prison sentence in community custody, i.e., at a halfway house or in home confinement.

Congress spoke unambiguously on this latter point: if an adult in custody does not have a disqualifying offense and maintains a low risk of recidivism, they shall be transferred to community custody. Congress was careful to eliminate any discretion on the part of the Federal Bureau of Prisons as to whether to transfer a qualifying adult in custody to community custody, in the process upending decades of prison practice and settled law.

For five years the BOP has resisted Congress' directives.

Petitioner asks this Court to enforce the First Step Act's plain text by transferring him to community custody. By doing so, the Court will be enforcing the law and helping address the Nation's mass incarceration crisis.

---

1 - Abbreviations used throughout this brief are listed in the Table of Abbreviations at the start of this document. Unless otherwise noted, internal citations and quote marks are omitted.

2 - See Atty. General's Sec 3634 Annual Report at 41-42 (June 2024). www.bop.gov (last accessed 10/2/2024). (Ann. Rep.).

A. Exhaustion is Unnecessary, or Futile.

Petitioner asserts that his claim is exempt from the administrative remedy process because it is either: a challenge to the BOP's statutory interpretation of the FSA, which creates a pure question of law: or without benefit to complete the process.

First, it is unnecessary because Petitioner's motion raises the purely legal question of: Whether the First Step Act mandates the transfer from carceral to prerelease custody of a qualified prisoner who has been assessed to have the necessary credits to be in community (prerelease) custody. This challenge rests on questions of law, making exhaustion unnecessary. See Gurzi v. Marques, No. 18-cv-3104 (NEB/KMM), 2019 U.S. LEXIS 208173, 2019 WL 6481212, at *2 (D. Minn. 2019) (excusing petitioner's failure to exhaust where the petitioner challenged the BOP's statutory interpretation), R&R adopted, 2019 Dist. LEXIS 207283, 2019 WL 6464939 (D. Minn. 2019).

Second, it is futile because waiting to fully exhaust this question would take six to nine months, would moot the relief Petitioner is requesting, and would provide no benefits to the process. See Vang v. Eischen, Case No. 23-cv-721 (JRT/DLM), 2023 U.S. Dist. LEXIS 149163 (D. Minn. 2023) See also Elwood v. Jeter, 386 F.3d. 842, 844 n.1 (8th Cir. 2004) (waiving exhaustion requirement based on the government's concession that "continued use of the [administrative] grievance procedure to contest the validity of the BOP's new policy would be futile").

B. Jurisdiction of the Court.

28 U.S.C. §2241 provides proper jurisdiction because Petitioner is seeking a speedier release from confinement by challenging the duration of his carceral sentence, not the fact of his conviction. Thus, the Petition is a traditional function of the Great Writ as courts have long considered these types of challenges the "heart of habeas corpus." See Preiser v. Rodriguez, 411 U.S. 475, 484, 498-500 (1973). In other words, challenges that allege a continuing carceral custody as illegal, are cognizable in a §2241 context.

Courts in this District have concluded that "questions of [prerelease] placement ... implicate the fact of duration of confinement because the difference between a prison and halfway house represents a quantum change in the level of custody." Silva v. Paul, Case No. 18-cv-02177 (ECT/ECW), 2019 U.S. Dist. LEXIS 21699 (D. Minn. 2019); Accord Woodall v. Fed. Bureau of Prisons, 432 F.3d 235 (3d Cir. 2005) ("confinement in a traditional Federal Prison is qualitatively different from any form of prerelease custody"); Wilkerson v. Dotson, 544 U.S. 74, 78 (2005) (J. Scalia, concurring).

Thus, Petitioner's challenge to the BOP's failure to effectuate his immediate transfer (under 18 U.S.C. §3632(d)(4)(C)) to some form of prerelease custody, once he has the calculated time credits to meet or exceed his earliest possible carceral release date, is properly before this Court.

If the Court finds it does not have jurisdiction via Habeas or Equity principles, Petitioner respectfully requests the Court permit him to take the steps necessary (including briefing) to bring this claim and allegations under the Court's Mandamus (28 U.S.C. §1361) jurisdiction.

## II. Factual Background of Case

Osorio-Calderon was sentenced to 151 months of BOP custody and no supervised release, after pleading guilty to the instant offense, by Judge Garcia-Gregory of the District of Puerto Rico of the U.S. District Courts. See Exhibit 4(a), BOP SENTRY Sentence Computation Sheet, Appendix of Exhibits (APP.) at page 16.

Osorio-Calderon's sentence commenced on January 30, 2018, /Id. He was held initially at a Federal Detention Center, eventually being transferred to FCI Texarkana in April 0f 2018, and then to FCI Sandstone in May of 2023. He started earning FTC's (at a rate of 10 credits for every 30 days) the day the FSA was enacted. During his transfer period between FCI Texarkana and Sandstone, Osorio-Calderon accrued 30 disallowed days. See November 2, 2024 FTC Assessment Report, Exhibit 3, APP. at 13. Starting on July of 2019, Osorio-Calderon started earning FTC's at 15 days for every month, and continues to do so today. /Id.

To-date, Osorio-Calderon has earned (banked) 1065 credits towards: the conversion of his sentence to supervised release (365 days), and transfer to pre-release custody (700 days). He is expected to earn 240 more credits before he is release from BOP on his "365" (or FSA PRD) date. See Exhibit 3 APP. at 15.

According to his unit team, Osorio-Calderon cannot transfer to his halfway house and will have to wait in federal custody for his FSA Projected Release Date of July 3, 2026 listed on his FTC Assessment Sheet, despite the BOP determining that his additional FTC's earn him a date to be released to prerelease custody of some form on September 16, 2024, /Id.

Osorio-Calderon has been given two reasons for this significant delay: 1) The Northern District of New York denied the request due to the residence not being suitable for supervision (Exhibit 2(b), 2(c); APP. at 7, 9); 2) Puerto Rico's RMM's office denied the request due to his offense and that one of his listed HC addresses was in close proximity to two private schools and a daycare center (Exhibit 2(a), 2(b), 2(c); APP. at 4, 7, 9); and 3) That no inmate is entitled to either RRC placement or placement of a particular duration and that the final decision as to the community program or placement length is within the discretion of the RRM (Exhibit 2(d); APP. 11. None of these reasons are in the controlling statute. Osorio-Calderon has an additional release address that would have met the safety guideline requirements of Puerto Rico but was not considered for HC evaluation as his other listed adress was, and was done so without any disclosable, valid reason.

Osorio-Calderon's current trasnfer date does not account for any Second Chance Act time. Which based on previous submittal by his unit team, he should be submitted for 271 to 365 days of Second Chance Act time, or a placement as early as July of this year.

From national news sourced (www.forbes.com) September 14, 2024 article "Bureau of Prisons Issues with First Step Act Lead

to Food Strike," inmates have been receiving the exact same muddled and confusing response from BOP facility unit teams executive staff that Osorio-Calderon has. See Exhibit 5, APP. pages 23 and 24.

On December 20, 2024 the American Civil Liberties Union (ACLU) filed a class action complaint for declatory and injuctive relief alleging the BOP regulations (and pattern of practice) violates the FSA. See Complaint at 2, Crow v. FBOP, Case No.: 1:24-cv-0582 (D. D.C. Dec. 20, 2024), ECF. 1. The ACLU's case relies on similar BOP FSA decisions and harms to the instant case. As a courtesy, and in further support of Petitioner's arguments he provides select filing(s) from the case Exhibit 6. See Motion for Preliminary Injuction and for Provisional Class Certification, Crow (supra), ECF 16 attached to Exhibit 6, see Rodqriguez v. Warden, Case No.: 0:25-cv00584-KMM-LIB, ECF 1-3 (D. Minn. 2025), APP. at 14 to 57.

## III. Reasons to Grant Writ

This §2241 is not the normal mine-run case of the typical pro se prisoner complaining about which halfway house, or how much halfway house time they received. Instead, this brief (and petition) is about how long and, when, a Petitioner has the statutory right to be held in prerelease custody.

With the passage of the First Step Act (2018), Congress statutorily recognized two forms of BOP custody: "carceral custody" and community "prerelease custody." Formalizing the quantum change (significant reduction) in the level of custody[3] afforded AICs. They did so, to mandate a tangible incentive (time credits) for a prisoner to participate in recidivism-reducing programming, while still balancing the need to protect the public and provide just punishment for past criminal conduct[4].

Recognizing prior BOP implementation failures, Congress specifically removed from the agency's discretion the when and whether a person must receive the time credits (reduced custody level) while leaving to the agency's sound discretion the mechanics (how & where) the prerelease custody was to be served.

To implement this scheme, Congress split the FSA's text between two sections of the U.S. Code: (a) 18 U.S.C. §3621, et seq. which is not subject to judicial review (See Sec. 3621(b)) nor review under auspices of the APA (See Sec. 3625); and (b) 18 U.S.C. §3631, et seq. which contains Congressional mandates and commands via use of the word "shall"[5].

3 - Dotson, 544 U.S. at 86

4 - FSA Ann. rep. at 4

5 - Antonin Scalia & Bryan A Garner, Reading Law, §11 Mandatory Permissive Cannon (2012); Accord Maine Community Health Options v. United States, 590 U.S. 296, 310 (2020) (Sotomayer)

This straddling of the FSA between non-discretionary actions and discretionary actions has created significant confusion in the courts; aided and abetted by the Agency's continuing obfuscation via regulatory linguistic shuffling of converting the statute's "shall" to a regulatorily permissive "may." **COMPARE** 18 U.S.C. §3632(d)(4) **WITH** 28 C.F.R. §§'s 523.42 & 523.44; and ill-equipped pro se litigants presenting incomprehensible poorly argued petitions.

At its base the purpose of Petitioner's Habeas is to require the BOP to comply with Congress' commands in the First Step Act to reduce the amount of time he remains incarcerated by the time credits he has accumulated under the FSA. In support of that gaol this brief answers the question:

> Whether the First Step Act mandates the transfer from carceral to prereleas custody of a qualified prisoner who has been assessed to have the necessary credits to be in community (prerelease) custody.

How we will answer the question is: first by confirming, under the "not withstanding clause," that the question is cognizable; Second, by looking at the statute's text to see if the BOP's reasons for delaying noncarceral custody transfer passed their acknowledged transfer date are vailid; Third how did the FSA change the BOP's authority on transfers to community custody?; and finally with these new understandings is Petitioner being held illegally?

A. Section 3621(b)'s "not withstanding" clause opens the door for this Petition to be heard on the merits.

Before the passage of the FSA, well established precedence, relying on §§'s 3621(b) and 3625, hold that placement decisions by the BOP are not reviewable by courts. However, FSA time credits fit neatly into the "not withstanding" exception noted in §3621(b) and lie outside §3625's reach.

While there is a circuit split on the issues, the Eighth Circuit has held that transfer to prerelease custody (also known as halfway house or home confinement) is not cognizable for section 2241 purposes but instead falls under 'conditions of confinement' claims. See Spencer v. Haynes, 774 F.3d 467, 470 (8th Cir. 2014). Because an inmate in a halfway house or home confinement is still under BOP custody as they are still serving BOP time, halfway house and home confinement are places of imprisonment. See Jorgensen v. Birkholz, Case No. 20-cv-2349 (NEB/DTS), 2021 U.S. Dist. LEXIS 130220, at *15 (D. Minn. 2021) ("home confinement is not release, but is a 'transfer' of the location of imprisonment"); Wessels v. Houden, Case No. 23-cv-1266 (WMW/ECW), 2023 U.S. Dist. LEXIS 194685, at *4 (D. Minn. 2023) ("Pre-release custody is not release from custody. Rather it is merely one form of BOP custody...[p]re-release custody is merely a change in the designation of imprisonment.")

Indeed, the courts in this District have repeatedly held that the BOP has exclusive authority to determine their placement of prisoners under 18 U.S.C. §3621(b) and such placement decisions are not reviewable. See Vang v. Eischen, Case No. 23-cv-721 (JRT/DLM), 2023 U.S. Dist. LEXIS 149163, at *11 (D. Minn. 2023).

But, Section 3621(b) states that, "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." 18 U.S.C. §3621(b) (emphasis added). The notwithstanding clause is key here because it assumes the subsection can be trumped by other law like the First Step Act of 2018. The Supreme Court in Tapia v. United States echoed this limitation: "[T]he BOP has plenary control subject to statutory constraints, over the place of prisoner's

imprisonment[.]" /Id. 564 U.S. 319, 331 (2011) (emphasis added). In other words, this placement power is not absolute, but is subordinate to the will of Congress.

Now that Petitioner has established the Court has jurisdiction (under either 28 U.S.C. §§'s 1361 or 2231) and there is a cognizable claim in front of the Court. The next step is to determine if the BOP's refusal to quantitatively change the Petitioner's custody is a valid implementation of Congress' statutory scheme.

B. The Bureau Of Prison's reasons for not transferring petitioner to prerelease custody are not valid under the Congressionally established statutory scheme.

There is a growing realization by courts that the clear language and precise directions found in 18 U.S.C. §3632(d)(4) have been impermissibly muddled by the BOP's obfuscation of Congress' command with regulatory permissive language allowing the agency to say use of prerelease credits is optional.

This agency action deserves absolutely no deference by this Court as the statute is unambiguous, nor is deference required post recent Supreme Court Decisions.

(1) The controlling statutes are clear and unambiguous, not requiring any agency interpretation, only compliance.

As always, to determine if an agency (here the BOP) acted within the scope of its authority, we must begin with the text of the statutes themselves. Groff v. DeJoy, 600 U.S. 447, 468 (2023).

The FSA impacted significant sections of the Federal Criminal Code, correcting long standing issues with good time credits, gun charge stacking, and compassionate release. It also upended traditional incarceration with the creation of an incentivised reduction system.

This petition's focus is on the time credits incentive, which Congress implemented in two sections of U.S. Code, Title 18: Amending §3624 and adding §§'s 3631-3635.

First, the Act inserted subsection (g) into §3624's existing text. The insert reads, in relevant part:

18 U.S.C. §3624(g): **Prerelease custody or supervised release for risk and needs assessment system participants**

**(1) Eligible prisoners.** This subsection applies in the case of a prisoner (as such term is defined in section 3635 [18 U.S.C.S. §3635]) who-

**(A)** has earned time credits under the risk and needs assessment system developed under subchapter D [18 U.S.C.S. §3631 et seq.] (referred to in this subsection as the "system") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment

**(B)** has shown through through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

**(C)** has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

**(D)(i)** in the case of a prisoner being placed in prerelease custody, the prisoner-

**(I)** has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

**(II)** has had a petition to be transferred to prerelease custody or supervised release approved by the warden or the prison, after the warden's determination

. . .

> (2) **Types of prerelease custody.** A prisoner shall be placed in prerelease custody as follows:
>
> (A) Home confinement.
>
> . . .
>
> (B) Residential reentry center. A prisoner in prerelease custody pursuant to this subsection who is placed at a residential reentry center shall be subject to such conditions as the Director of the Bureau of Prisons determines appropriate.

First Step Act of 2018, 115 PL 391, Sec. 101(b)(1), 132 Stat 5210 (2018).

Second, the Act created a whole new set of sections starting at §3631, et seq. Relevant here:

18 U.S.C. §3632. **Developement of risk and needs assessment system**

. . .

> (d) **Evidence-based recidivism reduction program incentives and productive activities rewards.** The System **Shall** provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs as follows:
>
> . . .
>
> (4) Time Credits.
>
> (A) **In general.** A prisoner, except for an ineligible prisoner under subparagraph (d), who successfully completes evidence-based recidivism reduction programming or productive activities, **shall** earn time credits as follows:
>
> . . .
>
> (C) **Application of time credits toward prerelease custody or supervised release.** Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities **shall** be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons **shall** transfer eligible prisoners, as determined under section 3624(g) [18 U.S.C. §3624(g)], into prerelease custody or supervised release.

First Step Act, P.L. 115-391, Sec. 101(a), 132 Stat 5196 (2018), (emphasis added).

These two amendments to Title 18 control the question of whether the Act mandates the transfer from carceral to community or prerelease custody, and they are the latest expression of Congress' will.

(a) Controlling law regarding statutory interpretation has recently changed.

Under both Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc. (467 U.S. 837 (1984)) and the recent Loper Bright Enterprises v Raimondo, 144 S. Ct. 2244 (2024) courts work within a two-step "framework to interpret statutes administered by federal agencies." Chevron at 842. The reviewing court must "First assess whether Congress has directly spoken to the precise question at issue...If and only if, Congress' intent is clear [,] that is the end of the inquiry." Loper Bright at 2250; Chevron at 843.

Courts understand words in a statute to have their "ordinary, contemporary, common meaning" and read the words in context, not isolation. SouthWest Airlines Co. v Saxon, 596 U.S. 450, 455 (2022). If a statute is "susceptible to more than one reasonable interpretation," then it is ambiguous, otherwise it is not. See LaCurtis v Express Med. Transps., Inc 856 F.3d 571, 578 (8th Cir. 2017).

(b) The plain text of §§'s 3624(g)(1) and 3632(d)(4)(C) are clear and can have only one meaning.

Congress *did* speak directly and precisely about prisoners receiving the incentives and rewards their participation in EBRR programs and PAs when they stated: the FSA "[s]ystem shall provide incentives and rewards ... as follows:" going on to enumerate four specific awards or incentives. See §3632(d)

The ordinary meaning of the phrase "shall provide incentives and rewards" is: the BOP is commanded or required[6] to make available[7] the awards and incentives enumerated in the statute. In other words, the awards & incentives listed in §3632(d)(1-4) will be made available to all eligible prisoners.

In subsection §3632(d)(4)(C), Congress spoke just as plainly, twice saying "[a]pplication of credits towards time" in either form of community custody. And then again, based on the BOP's poor track record with the SCA, the Legislature repeated itself stating: "The Director [of the BOP] shall transfer eligible prisoners ... into either prerelease custody or supervised release." /Id.

Again the ordinary meaning is easily ascertainable: The agency is required[8] to cause or use[9] the credits, as part of a payment[10], to a prisoner's time in community custody. Further, the BOP Director is to move[11] an eligible prisoner from-one form of custody --carceral-- to another -community.

The final phrase to analyze is "eligible prisoner" (3632(d)(4)(C)) which the Statute says is defined in §3624(g)[(1)]. That subsection defined eligible prisoners as those who: Have earned time credits (/Id. at (A)); has demonstrated either a reduction in his recidivism, or maintained a minimum low risk to recidivate (/Id. at (B));

---

6 - SHALL second & third meaning, Webster's New World College Dictionary (4th ed. 2010) (Webster's): ACCORD SHALL first & second meaning, Blacks Law Dictionary (10th ed. 2014)

7 - PROVIDE second meaning, Webster's

8 - See FN 6, Supra

9 - APPLIED second meaning, Webster's

10 - TOWARD sixth meaning, Webster's

11 - TRANSFER first meaning, Webster's

has the remainder of their imposed term computed ((C)); and either has maintained a minimum or a low rating for the last two assessments or received permission from the warden. /Id. a (D). The statute clearly delineates, with no open ended phrases, who is eligible.

Yet, "eligible prisoner" is equally clear in its plain meaning as it turns on the customary, meaning of eligible, which, relevant here is to be able[12] (or receive) time credits. In other words, a prisoner is entitled to receive the time credits if they meet the straight forward criteria of (1) have they earned some credits; (2) Have they maintained a low or better recidivism score or reduce their chances of returning during their incarceration; (3) that their remaining sentence has been calculated; and (4) did the Warden grant permission or have they had a low or minimum PATTERN score for the last two assessments? If yes to all four, then the prisoner is eligible to receive the benefits of a transfer. The plain text requires they be removed from carceral custody and moved to some form of community custody.

These interpretations are supported by discussions on the floor of the senate during the debate for the FSA, where Senator Cornyn discussed the intent of the Act in regards to incentives:

> The incentives in this program are really important. I think we, as human beings, all operate based on incentives, and the incentive for prisoners is to go through the program, gain the earned credits *so that they can be released*. Not to shorten their sentence but be moved to less confining conditions, for example, a halfway house.

14 Cong. Rec. S7746 (Daily Ed. Dec 18, 2018) (Statement of Senator John Cornyn).

---

12 - ELIGIBLE first meaning, Webster's

This sentiment (and Congressional intent) is echoed in the language choices delineating the other incentives that the FSA "[s]ystem shall provide" (§3632(d)), such as: extra phone and visiting privileges that complying prisoners "shall receive" (d)(1); transfers to another institution that "shall be considered" (d)(2); or a list of additional types of extra benefits, any two of which "shall [be] included" at every facility. /Id. At (d)(3).

When viewed in context, the language choices, simple directives, and straight forward nature of the process establishes there are no gaps to be filled by agency interpretation; one meaning that being: an eligible person shall receive use of the credits he has accumulated; and that the BOP is tasked with simply making the transfer happen. They are not authorized to determine when, or if, a prisoner can "spend" the time credits (or other incentives) their compliance with the objectives of the FSA have earned them.

The text of the statute is clear, and unambiguous, Congress spoke directly to the question on whether or not a transfer to noncarceral custody is mandated. Therefore both the Loper Bright and Chevron inquiries end here.

If, in the alternate, the Court finds parts of the statute is ambiguous, then the Petitioner would urge the Court finds that the BOP's interpretation (as evidenced by regulation, procedures, and practice) is contrary to the statute, and is an unreasonable interpretation under the Loper Bright standard. See the following section for Petitioner's alternative arguments.

(2) Post Loper Bright, (144 S. Ct. 2244) judicial deference to agency interpretation is either inapplicable or requires that any previous rulings on FSA time credit incentives be thoroughly reexamined.

Assuming arguendo, the Court finds there are parts of 3632(d)(4) that are ambiguous, Petitioner will now argue why neither existing precedence, nor the BOP's interpretation are applicable.

At the heart of this Brief and Petition is the question: Is a prisoner's noncarceral custody time mandated by the FSA? After a thorough review of all the case law available to him, Petitioner believes the existing rulings that might be pertinent here fall into two categories: placement issues, or cursory reviews that rely on the Chevron deference to rule against the Petitioner. Neither category rests on a sound testing of the BOP's interpretation of the FSA.

A sound testing is what is called for here because Congress, with the passage of the FSA, upended the traditional understanding of what BOP custody means, what it entails, and how a prisoner should receive the quantum change in their custody levels that those changes require to occur.

(i) Following Loper Bright, Federal Courts, not Administrative Agencies, must construe ambiguous statutes in situations where Chevron used to require deference to the agency's statutory interpretation.

Following the Supreme Court's decision in Loper Bright, "[c]ourts must exercise their independent judgement in deciding whether an agency has acted within its statutory authority." Loper Bright,

144 S. Ct. at 2273. Although courts may still use the judgement of an agency to inform their interpretive exercise, and courts must respect statutory delegations of authority while ensuring that the agency acts within constitutional limits, courts are no logner permitted - let alone required - to "defer to an agency interpretation of the law simply because a statute is ambiguous." (/Id.)

In overturning Chevron, the Loper Court particulary disfavored the portion of Chevron which discounted "the reading the court would have reached if no agency were involved" in favor of deferring to the agency. Loper Bright, 144 S. Ct. at 2266. The Court unambiguously stated that when it comes to statutory interpretation "the reading the court would have reached" is the "best reading" of the statute, regardless of whether different judges may or may not consider the statute to be ambiguous. /Id.

Therefore, Petitioner urges the court to find the BOP's interpretatic (exemplified by practice and procedure) of section 3632(d)(4)(C); that Petitioner is unable to use FSA time credits he has earned because there are no RRC beds ,is contrary to the statute ; does not bind or limit the Court's independent judgement. "[I]t is emphatically the province and duty of the judicial department to say what the law is," Loper Bright, 144 S. Ct. at 2257 (quoting Marbury v. Madison, 1 Cranch 137, 177 (1803)) and when it comes to statutory interpretation "there is a best reading" and that best reading is "the reading the court would have reached if no agency were involved." Loper Bright, 144 S. Ct. at 2266.

Petitioner requests the Court to find section 3632(d)(4)(C) unambiguous, but if the Court finds otherwise, he asks the court to no extend Chevron-like deference to the BOP's interpretation. Instead, the Court is requested to use the standard tools of statutory interpretation and find the best reading of the statute - the reading the Court would have reached if no agency were involved - to be that the FSA mandates the transfer from carceral to prerelease custody of a qualified prisoner who has been assessed to have the necessary credits to be in community (prerelease) custody.

(3) In promulgating the relevant regulations the Department of Justice impermissibly altered the implementation of the FSA Time Credits Incentive, when they performed a linguistic shuffle of critical words.

Our government was formed with inherent checks and balances. One of the foundational checks was the Legislative Branch held the power to set law and establish national policy, and the Executive Branch executes the law. While the Judicial Branch ensured the Executive faithfully interprets what Legislature wrote.

That balance is being upset here when the Department of Justice overstepped their authority. When promulgating regulations the "published rules in the Federal Register, [where[ the word "may" was placed in several areas within the rule rather than the word :shall" reflected in the law regarding the application of time credits. The impact of this subtle change was not recognized by the stakeholders or the public and little, if any, opposition was expressed during the comment period regarding the more passive language.

When the DOJ quietly shuffled the wording to more permissive language, the Executive Branch altered the entire meaning of the statute. This paved the way for all of the implementation abuses the BOP has committed when implementing the FSA. For a national perspective on the harm caused by this permissive language. Please see Exhibit 6 at page 9-12 (App. 31-34).

For the reasons outlined here, and in Exhibit 6, the regulation should be wholly disregarded in any analysis the Court peforms.

(4) The BOP's reasons for not transferring petitioner to prerelease custody are not valid under the FSA's statutory scheme.

As established in the proceeding sections, Congress was very specific in the criterion that can be applied to disqualify --at the time of transfer-- a prisoner's eligibility to move to community custody. §3624(g)(1). If a prisoner meets those four requirements, she shall have the assessed credits "applied towards" her time in "prerelease custody or supervised release" (§3632(d)(4)(C))) and the BOP Director "shall transfer" her to either form of community custody. /Id.

Nowhere in the controlling statutes does Congress allow for (or even allude to) 'lack of prerelease capacity,' on the part of the BOP, as a valid reason to not transfer the prisoner. In fact, under §3624(g)(11) the Director was commanded to "ensure there is sufficient prerelease custody capacity" to meet the needs of all eligible prisoners.

Here, Petitioner has accumulated 1065 credits (Exhibit 3, APP. at 15, plus an additional 4 months (60 FTC's) earning the maximum one year conversion to supervised release, and banking more than 700 more credits, meeting §3624(g)(1)(A); he was never above a low recidivism score (APP. at 14). meeting §3624(g)(1)(B and D); and had the remainder of his sentence calculated, §3624(g)(1)(C).

In fact, the BOP has admitted, accounting for some future credits, Petitioner's transfer to prerelease custody should be no later than September 16, 2024, almost two years past his his current noncarceral placement date of July 3, 2026 due to his BOP determined ineligibility to be placed into RRC/HC.

There is no valid reason why Petitioner should not have been transferred by or before September 16, 2024, but for the illegal actions of the BOP.

C. Post the First Step Act of 2018 the BOP's previously unlimited authority is now clearly delimited to how and where to apply credits, but no longer extends to whether, or how many credits, Petitioner is to receive.

With the advent of the FSA, BOP custody has been transformed into a more fluid concept; one that has been built-in carceral and custody components.

In passing the FSA, Congress recognized the BOP's abysmal record of implementating Congress' prior directives[13] by placing the implementing statutes into discretionary and nondiscretionary sections.

The who is eligible and when a prisoner moves from carceral to community custody is controlled in the nondiscretionary section of Title 18 of the Y.S. COde: the newly minted section 3632. The how and where a prisoner moves to community custody was left to

---

13 - See Rodriguez v. Smith, 541 F.3d 1180, 1189 (9th Cir. 2008) (invalidating the BOP's initial implementing regulations for the SCA because 28 C.F.R. §570.21 contradicted the "plain language and intent of [28 U.S.C.] §3621(b)."

the discretion of the BOP, by amending existing section 3624 and adding a new subsection (g).

in §3632, Congress carved out from the BOP prisoner population s sepcific cohort of AIC's who are capable of earning time credits to be used against continuing incarceration.

This FSA cohort can earn a distinct form of prerelease custody via participating in recidivism reduction activities and programming. 18 U.S.C. §§'s 3631-3635. All AIC's can participate and earn the first three FSA incentives created by Congress, §3632(d)(1-3), but only the identified cohort can earn time credits, §3632(d)(4).

The time credit incentive is provided by bifurcating the cohort's BOP custody into two discrete portions: carceral and noncarceral custody, §3632(d)(4)(C). Their actual BOP custody can be shortened by up to a year when the last 365 days of custody is converted to supervised release, if the prisoner earns that much. §3632(d)(4)(C) and §3624(g)(3).

A prisoner can then earn unlimited credits towards early community based custody, a key difference differentiator between SCA time (max 12 months, §3624(c)(1)) and FSA time credits which are unlimited. See §3624(g)(10).

This bifurcation was intentional: placing the who is eligible; how many credits they are to earn; and the 'shall transfer' command into an FSA created separate subchapter in Title 18's Chapter 229 (subchapter D, §§'s 3631-3635 U.S.C.S.) which is outside the discretion of the BOP. And then amending the existing custody release statutes (Chapter 229, subchapter C, §§'s 3621-3625 U.S.C.S.) with the FSA specific mechanics of the transfer.

By separating the mechanics command from the eligibility and transfer text, Congress addressed the BOP's poor record[14] with the SCA, allowing the agency to continue to control placement but expressly removing from their discretion decisions on the whom the how much, and when the FSA cohort uses Time Credits. In other words, Congress kept from the BOP's control defining who is, and when, an FSA cohort member will be transferred. But left to the BOP the clerical tasks to be performed via an explicit set of statutory directions.

Based on the intentional actions of Congress in the placement, verbage, and structure of the two changes to Title 18 of the U.S. Code one can surmise: what the legislature intended to be outside the BOP's discretionary purview, what was left in the BOP's hands, as well as what additional resources Congress authorized for the agency (with U.S. Probation's help) to achieve the over-arching goals of the First Step Act of 2018.

> (1) 18 U.S.C. §3632 the BOP's role is limited to the record keeping tasks of: identifying qualifying prisoners; calculating their credits; and calculating their "shall transfer date."

The core determination of FSA time credit incentives (who, how much, and when) is what Congress specifically removed from the BOP's discretion, both by repeatedly using "shall" versus "may", and placing the operative statute outside the reach of 18 U.S.C. §3625. Congress clearly and unambiguously telegraphed its clear direction on this question. <u>See</u> subpart B(1), <u>supra</u>; <u>See Also</u> §3632(d) (stating that the FSA system "shall provide incentives and rewards to prisoners who have made specific progress to reduce their chance of returning

---

**14** - <u>Rodriguez</u>, 541 F.3d at 1189

to prison"). Approximately 55% of the AIC population is currently earning credits and over half of which are currently eligible to receive the noncarceral custody benefit. See Ann. Rep. at 18-19.

This was the FSA's purpose all along. Courts would go against the legislative intent of the Act if prisoners who have earned credits under the statute (and thus the Statutory Right to be moved to less confining places to re-enter society) are denied the ability to transfer to non-carceral settings simply due to the BOP's failures to effectuate the logistics of the mandated prerelease custody transfer.

The BOP has convinced many courts that FSA time credit placement and Second Chance Act time are the one and same[15], even going so far as to draw parallels between FSA credits and RDAP credits and placements[16]. 18 U.S.C. §3624(e). Respectfully, these holdings, after a thorough review of the controlling statutes' structure, and verbage cannot stand as the FSA Time Credit benefit was intentionally designed to be different.

Besides missing the structural (and textual) differences apparent in the text, there is one key feature of FSA Time Credits that distinguishes them from SCA or RDAP time: FSA Time Credits are unlimited. See §3624(g)(10) (A subsection that was inserted by the FSA, reading in pertinent part: "time limits under subsection (b) and (c) [of §3624] shall not apply to prerelease custody under" subsection g.

---

15 - United States v Smith, Case No.: 6:15-cr-00006-001, 2019 U.S. Dist. LEXIS 145212, at *5 (W.D. Va. 2019)(Moon, J.) ("While the Second Chance Act and the First Step Act expand the BOP's authority to place prisoners, they do not vest placement authority in this Court."); William v Warden, Allenwood-Low, Civil No.: 23-cv-509-LM-AJ, 2024 U.S. Dist. LEXIS 165919, at *12 (M.D. Pa. Sept. 16, 2024) ([N]othing in the Second Chance Act, First Step Act, or §3621(b) entitles an inmate to any guaranteed placement in an RRC"); Luque v Fed. Bureau of Prisons, Case No.: 23-CV-3893 (NEW/DLM), 2024 U.S. Dist. LEXIS 69190, at *8 (D. Minn. Mar. 5, 2024) ([N]othing in the SCA or the FSA abrogates the BOP's authority to designate the placement of prisoner").

16 - Goodwin v Goldey, Case No. CIV-23-00773-PRW, 2023 U.S. Dist. LEXIS 230808, at *3 (W.D. Okla. 2023) ([E]arly release via either FSA time credits or completion of the RDAP program rests firmly in BOP discretion.")

The first 12 months of earned FSA credits are to be applied towards conversion to supervised release (§3624(g)(3)); and the remaining credits go towards unlimited RRC or HC time (§3624(g)(2)).

Further, the BOP's plenary authority has been cabined by the statutory constraints enacted in the FSA. <u>See</u> <u>Tapia</u> 564 U.S. at 331 (discussing that the BOP's general plenary authority over custodial transfers is "subject to statutory constraints"). This curbing of the BOP's authority was enacted by Congress to effectuate a prisoner's transfer to noncarceral custody, so that the time credit incentive (§3632(d)(4)) had actual value.

The "as determined under Section §3624(g)" language located in §3632(d)(4)(C) does not keep discretion in the BOP's hands. Section 3624(g) is clearly about eligibility *at the time of transfer* to prerelease custody, and nothing more. A plain reading of the statute cannot possibly trigger a §3624(c) override or even a §3621(b) one. Section 3624(c) is for prisoners who are not FSA-eligible and has qualifying language "to the extent practicable." Sec. 3632 (d)(4)(C) does not.

Congress has left the last step of spending the early release credits to the BOP, under a carefully explained unambiguous scheme as defined in §3624(g)(1 & 2), <u>See</u> subpart B, <u>supra</u>.

(2) The BOP's exclusive placement authority regarding pre-release transfer under 18 U.S.C. §3621 is now limited to the mechanics of how and where the FSA cohort pre-release transfers occur.

The Legislature placed boundaries on the BOP's community custody transfer procedures: first by applying credits to an early transfer to supervised release (§3624(g)(3)); and then applying the remaining credits to other forms of prerelease custody as carefully defined in §3624(g)(2). It also specifically stated that the prisoner will

spend the credits earned when the total credits (including projected credits to be earned in prerelease custody) equates to his release from BOP custody date, aka the so called "shall transfer" date.

The BOP's role is limited to clerical tasks for FSA incentives. These tasks include computing the who gets incentives and how much of a specific incentive they receive. These calculations are based on specific criteria delineated by Congress within the statutes.

However, the BOP still retains control over the where, and the how, all of the incentives are awarded. The statutory structure, and placement of the time credit incentive informs the reader of Congress' intentions to remove who and what decsiions from the BOP; while leaving the agency to award the incentives once earned.

Congress recognized that the BOP has limitations and statutory restraints on providing prerelease custody services. They then expanded who can provide certain community custody options, making the expanded services available to the FSA time credit cohort.

(3) Congress authorized partnerships with the U.S. Probation and Pretrial Services to assist with "any prisoner's" FSA prerelease, and to assume supervision of home confinement prisoners.

Congress recognized that community supervision is not the BOP's forte, nor do they have the infrastructure to manage large numbers of AIC's in the community. But that U.S. Probation has both the experience and the structure to do so. Therefore Congress opted to permit, and to an extent, require the BOP to reach out to Probation Services for assistance in managing AIC's in prerelease custody while simultaneously ensuring Probation answers, Congress inserted the following two subsections

into §3624(g):

> (7) **Agreement with United States Probation and Pretrial Services.** The Director of the Bureau of Prisons shall, to the greatest extent practicable, enter into agreement with United States Probation and Pretrial Services to supervise prisoners placed in home confinement under this subsection. Such agreements shall--
>
> (A) authorize United States Probation and Pretrial Services to exercise the authority granted to the Director pursuant to paragraphs # (3) and (4); and
>
> (B) take into account the resource requirements of Unites States Probation and Pretrial Services as a result of transfer of Bureau of Prisons prisoners to prerelease custody or supervised release.
>
> (8) **Assistance.** United States Probation and Pretrial Services shall, to the greatest extent practicable, offer assistance to any prisoner not under its supervision during prerelease custody under this subsection.

18 USC §3624(g)(7-8)

Petitioner cannot determine to what extent (or if) the BOP has reached out to Probation Services in the half decade since the FSA was enacted, let alone to the "greatest extent practicable." But, there is no evidence in the public space indicating they have, or that the parties have reached an agreement.

At minimum this authorization belies the BOP's assertion that they "lack resources," and supports the conclusion that the so called resource crunch the BOP is experiencing is of their own manufacturing. This supports a conclusion of their willful failure to abide by the law, and the granting of Petitioner's Motion under 28 U.S.C. §2241, Doc. 1.

## IV. Conclusion

For the last six years the BOP has treated the clear mandatory language in the FSA as optional, thereby imprisoning people longer than legally permissible. This becomes apparent by a simple review of BOP policy, regulation, and their nationwide practice.

What case law has developed around this issue is flawed because: (1) most courts were led to believe the claimants were just asking for more RRC time due to the pleading naivete of pro se prisoner litigants; (2) no previous petitioner has asked the court to do an in-depth textual analysis, or consider how the FSA up-ended decades of settled law by creating two separate forms of BOP custody; and (3) no court that the Petitioner is aware of has fully analyzed these arguments as applied to the controlling sections of the FSA.

If the bop is allowed to illegally withhold earned time credits for extra statutory reasons -the very lynchpin of the FSA- the time credit incentive is with little to no value making the re-entry goals of the statute significantly reduced.

Currently, due to the illegal acts of the BOP and extra Constitutional decisions of the DOJ, the distinct form of time credit incentive created by the FSA (§3632(d)(4)) has failed to live up to what Congress expressly intended.

Osorio-Calderon's case presents a prime example of the misapprehension and misapplication of Congress' aspirations for the FSA.

For all of the reasons, law, and facts articulated in this Brief, his Petition, and the presented exhibits Osorio-Calderon respectfully request this Court to grant the specific findings and relief has has requested on pages 14 to 17 of his Petition filed at docket entry one of this action.

RESPECTFULLY SUBMITTED THIS 16 DAY OF MARCH, 2025.

Jose C. Osorio Calderon

Jose Osorio-Calderon
Pro se Petitioner
49425-069 Unit J
FCI Sandstone
P.O. Box 1000
Sandstone, MN 55072

## Meet and Confer Statement
## (LR 7.1(a)(1))

Due to the exigencies of his incarceration, Osorio-Calderon requests the Court to waive any meet and confer requirements under D. Minn. L.R. 7.1(a) as he is unable to comply with its requirements at this time.

Jose C. Osorio Calderon

Jose Osorio-Calderon
Petitioner pro se